POLLAK, District Judge:
In this suit initiated in the District Court for the Northern District of California and arising under the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692-1692o (“FDCPA”), and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 (“RICO”), to which were annexed certain supplemental state-law claims, the plaintiffs-appellants are Stephen Turner; his wife, Susana Turner; the Turner children, Daniel, Deborah and David; and Western Paramedical Services, LLC (“WPS”), an entity that employed the Turners.[1] The defendants-ap-pellees are Ah Beng Yeo, E.A. Martini, David J. Cook, and Cook, Perkiss & Lew, a law firm in which Cook is a partner. The plaintiffs-appellants’ federal claims are that actions taken by Yeo and Martini, represented by Cook, to levy execution on an antecedent state-court tort judgment in favor of Yeo and Martini and against Stephen Turner, contravened the FDCPA and RICO. The actions of appellees of which appellants complained included pursuing a fraudulent conveyance action against Stephen Turner in a California state court and communicating with numerous insurance companies in order to accelerate the collection process.
From District Court orders sequentially dismissing the FDCPA and RICO claims (and, with them, the supplemental state-law claims), plaintiffs-appellants appeal. We affirm.
Background
On August 21, 1998, after a jury trial in the Superior Court for Contra Costa County, in California, appellees Yeo and Martini obtained a judgment against Stephen Turner for more than $1,000,000. According to appellants’ First Amended Complaint in the District Court, “the judgment arose from allegations of various *1223 business interference torts by Stephen Turner against Yeo and Martini.” Yeo and Martini retained Cook and his law firm Cook, Perkiss & Lew to assist in collection of the judgment — assistance which appears to have continued until March, 2002.[2] On October 29, 1999, Cook filed a complaint in the Superior Court for Contra Costa County on behalf of Yeo and Martini against Stephen Turner, alleging that Turner, under the express direction of Susana Turner, had fraudulently conveyed his real and personal property, including his home, to a family limited partnership and a limited liability company, each allegedly controlled by the Turners, with the intent to prevent Yeo and Martini from collecting the money owed on the August 21,1998 judgment.
On October 15, 2001, in response to the Yeo-Martini fraudulent conveyance action, Stephen and Susana Turner, suing for themselves and on behalf of their children, filed this action in the United States District Court for the Northern District of California, claiming violations of the FDCPA and various state laws. Subsequently an amended complaint was filed, which included all of the allegations in the original complaint and added RICO claims. The amended complaint included WPS as a plaintiff on the RICO claims and on a California Unfair Competition Act claim. WPS was not a plaintiff on the FDCPA claim or on the state-law claims other than the Unfair Competition Act claim.

The First Amended Complaint

In their FDCPA claims, the Turners alleged that appellees, as part of their efforts to collect on the state-court judgment, dispatched false and misleading communications — by mail, fax and telephone — to numerous insurance companies thought to be debtors of WPS, in violation of 15 U.S.C. §§ 1692c(b), 1692e(2)(A), 1692e(3), 1692e(9), 1692f(l).[3] According to the Turners, these communications falsely represented that the Superior Court for Contra Costa County had ordered all “accounts, accounts receivable, and other rights ... generated by Stephen Turner, or any entity of[sic] his behalf,” including WPS, to be turned over to Yeo and Martini. The Turners asserted that because WPS was not owned, operated or controlled by Stephen Turner, the Superior Court’s order applied only to Stephen Turner and not to WPS. The Turners also claimed that appellees’ fraudulent conveyance filings in the Superior Court contained “false, deceptive and improper statements.” Specifically, the Turners objected to (1) references to Stephen Tur *1224 ner’s prior misdemeanor criminal conviction and (2) a characterization of a Turner family trust — the Golden Gate Trust — suggesting that it was a “collusive trust” created to assist Stephen Turner in hiding his assets. The Turners also alleged that ap-pellees engaged in conduct to “harass, oppress or abuse” them, in violation of 15 U.S.C. § 1692d[4] arid § 1692f(6).[5] This alleged conduct included (1) serving excessive copies of court papers on the Turners; (2) improperly serving them with documents intended for other parties, such as a Nevada limited liability company; (3) making false statements in an August, 2001 court filing regarding the sale of appellants’ residence; and (4) Cook’s statement to Stephen Turner that: ‘You dirty Jew, I’ll take everything away from you.”
In their RICO claims, the Turners, now joined by WPS, charged appellees with violating 18 U.S.C. § 1962(c),[6] which prohibits a person from participating, “through a pattern of racketeering activity,” in the conduct of the affairs of an “enterprise” whose activities affect interstate commerce, and 18 U.S.C. § 1962(d),[7] which prohibits conspiring to violate any of the three antecedent provisions of § 1962. The “enterprise,” according to appellants’ allegations, was Cook’s law firm. The alleged “racketeering activity” involved the same mail, fax and telephone communications attributed to Cook’s law firm in the Turners’ FDCPA claims. This “racketeering activity,” according to appellants, had been “continuous since the filing of the subject turnover order (dated July 18, 2000D ], through the present,” and resulted in the “loss of money” for WPS, the loss of the “prospective economic advantage of developing the fledgling business of [WPS] into a viable business entity” for Stephen and Susana Turner, and the Turners’ loss of “the prospects of continued and lucrative employment with [WPS].”
The District Court, in an order issued March 22, 2002, dismissed the FDCPA portions of the amended complaint on the grounds that the debt in question — the tort judgment — was not subject to the FDCPA. The District Court also dismissed appellants’ RICO claims for failing to satisfy RICO’s continuity requirement, but granted appellants leave to file “an Amended Complaint alleging a RICO violation.”

The Second Amended Complaint

On April 22, 2002, the Turners and WPS filed a Second Amended Complaint in which they expanded upon their earlier RICO claims. In this complaint appellants alleged that appellees had sent out “hundreds” of letters and facsimiles to third-party insurance companies misrepresenting the substance of the Superior Court order — an activity that amounted to a continuous “pattern of related, non sporadic repetitious and highly numbered incidents ... of ... illegal racketeering conduct” in violation of 18 U.S.C. §§ 1962(c) and (d). *1225 Each time appellees engaged in this activity, appellants maintained, appellees committed an act of mail or wire fraud that was intended to “snare the continual billing activities of [WPS] by having [these] insurance companies divert payments wave after wave.” Beside the economic loss ap-pellees’ allegedly fraudulent conduct caused WPS, appellants contended that ap-pellees’ conduct would have negative economic consequences for Stephen and Susana Turner because the Turners had “both lost the business expectancy of a good employment relationship with [WPS],” and would not receive their salaries if WPS suffered financial harm. Appellants maintained that the Turner children would also be harmed, since the children were the ultimate beneficiaries of the Golden Gate Trust, the Turner family trust which owned WPS.[8]
Appellants also alleged that:
approximately [in] March, 2002, Cook and Cook, Perkiss & Lew substituted out as counsel of record on the fraudulent conveyance and other actions, and thus the racketeering activity is ‘closed end’ and is not expected to repeat. However, when it was going on, it was open ended and was never expected to stop, because Turner is in fact judgment proof, and as long as the judgment remains unpaid and Cook is on the case, these sort[s] of improper mailings ete[.] would be mailed out. It was the filing of the present lawsuit that caused Cook and Cook, Perkiss and Lew to withdraw of [sic] the cases, and thus shifted the activity to closed end.
On August 28, 2002, the District Court dismissed the Second Amended Complaint, concluding that appellants had failed to allege any threat of continuing illegal activity, which is required to establish a pattern of racketeering under RICO. The court dismissed without prejudice appellants’ state-law claims, and entered final judgment against appellants. Appellants timely filed their appeal on September 20, 2002. This court has jurisdiction under 28 U.S.C. § 1291.
Standard of Review
A judgment dismissing a case on the pleadings is reviewed on appeal de novo. Mendoza v. Zirkle Fruit Co., 301 F.3d 1163, 1167 (9th Cir.2002). The appellate court must “accept all material allegations in the complaint as true and construe them in the light most favorable to [the non-moving party].” NL Industries, Inc. v. Kaplan 792 F.2d 896, 898 (9th Cir.1986). A dismissal may be affirmed “only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.” Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).
Standing of plaintiff-appellant Stephen Turner to pursue this appeal
Because Stephen Turner has filed for bankruptcy in the United States Bankruptcy Court, Northern District of California, he is no longer a real party in interest in this matter and has no standing to pursue this appeal. When Turner declared bankruptcy, all the “legal or equitable interests” he had in his property became the property of the bankruptcy *1226 estate and are represented by the bankruptcy trustee. See 11 U.S.C. § 541(a)(1). Causes of action are among such legal or equitable interests. Sierra Switchboard Co. v. Westinghouse Elec. Corp., 789 F.2d 705, 707 (9th Cir.1986).
The trustee in Turner’s bankruptcy ease has, in a letter to Turner’s counsel, indicated his willingness to allow Turner to proceed with his appeal. However, the letter, the pertinent text of which is set forth in the margin,[9] is insufficient to confer authority on Turner’s counsel to prosecute this appeal because it fails to effectuate an actual abandonment of the trustee’s interest in Stephen Turner’s causes of action — to the contrary, the letter contemplates the estate’s pursuit of these causes of action “[i]n the event that,” via this appeal, “the dismissal is overturned.” Section 554 of title 11 of the United States Code requires notice and a hearing for abandonment to occur, and Bankruptcy Rule 6007 requires the trustee to give notice of a proposed abandonment to all creditors. Nothing in the record indicates that these steps have occurred. Accordingly, since we conclude that Stephen Turner has no standing to bring this appeal, the appeal is dismissed as to him.[10] However, we do reach the merits of the appeal as to the other appellants.[11]
Discussion

FDCPA

In enacting the FDCPA, Congress sought to counter the abusive, deceptive and unfair debt collection practices sometimes used by debt collectors against consumers. See 15 U.S.C. § 1692.[12] The Act allows aggrieved parties to recover damages, attorney’s fees and costs. Id. § 1692k(a). Because not all obligations to pay are considered debts under the *1227 FDCPA, a threshold issue in a suit brought under the Act is whether or not the dispute involves a “debt” within the meaning of the statute. Slenk v. Transworld Sys., Inc., 236 F.3d 1072, 1075 (9th Cir.2001). The FDCPA defines debt as “any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes ...” 15 U.S.C. § 1692a(5); see also Bloom v. I.C. Sys. Inc., 972 F.2d 1067, 1068-69 (9th Cir.1992) (explaining that the FDCPA applies to debts incurred for personal rather than commercial reasons). The Act defines “consumer” as “any natural person obligated ... to pay any debt.” Id. § 1692a(3). The Act does not define “transaction,” but the consensus judicial interpretation is reflected in the Seventh Circuit’s ruling that the statute is limited in its reach “to those obligations to pay arising from consensual transactions, where parties negotiate or contract for consumer-related goods or services.” Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C., 111 F.3d 1322, 1326 (7th Cir.1997) (citing Shorts v. Palmer, 155 F.R.D. 172, 175-76 (S.D.Ohio 1994) (obligation to pay for shoplifted merchandise not a “debt” under the FDCPA because “plaintiff has never had a contractual arrangement of any kind with any of the defendants.”)); see also Mabe v. G.C. Servs. Ltd. P’ship, 32 F.3d 86, 88 (4th Cir.1994) (obligation to pay child support not a “debt” under the FDCPA because it was not incurred in exchange for consumer goods or services).
This court has not heretofore had occasion to address the question of whether a tort judgment resulting from business-related conduct qualifies as a debt under the FDCPA. However, the Eleventh Circuit in Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367 (11th Cir.1998), ruled on a similar issue and concluded that a tort judgment does not constitute a debt, and, therefore, that the FDCPA does not apply. In Hawthorne, the plaintiff was in an accident, allegedly resulting from her negligence, for which the defendant had been assigned subrogation rights. Id. at 1369. After the defendant attempted to collect its claim, the plaintiff sued under the FDCPA. Id. The district court ruled in the defendant’s favor, concluding that the obligation at issue did not constitute a “debt” under the FDCPA, and the Eleventh Circuit affirmed. Id. at 1369-70.
The core of the appellate ruling in Hawthorne was as follows:
By the plain terms of the statute, not all obligations to pay are considered “debts” subject to the FDCPA. Rather, the FDCPA may be triggered only when an obligation to pay arises out of a specified “transaction.” Although the statute does not define the term “transaction,” we do not find it ambiguous. A fundamental canon of statutory construction directs us to interpret words according to their ordinary meaning. The ordinary meaning of “transaction” necessarily implies some type of business dealing between parties. In other words, when we speak of “transactions,” we refer to consensual or contractual arrangements, not damage obligations thrust upon one as a result of no more than her own negligence. While we do not hold that every consensual or business dealing constitutes a “transaction” triggering application of the FDCPA ... at a minimum, a “transaction” under the FDCPA must involve some kind of business dealing or other consensual obligation. Because [appellant’s] alleged obligation to pay [appellee] for damages arising out of an accident does not arise out of any consensual or business dealing, plainly it *1228 does not constitute a “transaction” under the FDCPA.[13]
Hawthorne, 140 F.3d at 1371 (internal citations omitted).
We agree with this well-reasoned Eleventh Circuit opinion, and we conclude that the District Court did not err in dismissing the FDCPA claims. Appellees brought the fraudulent conveyance action against Stephen Turner[14] in an effort to collect a tort judgment. According to appellants’ own pleadings, that judgment resulted from alleged business interference torts, not any consumer transaction. See Hawthorne, 140 F.3d at 1371(“[A]t a minimum, a ‘transaction’ under the FDCPA must involve some kind of business dealing or other consensual obligation.”); Bass, 111 F.3d at 1326; see also Bloom, 972 F.2d at 1068-69 (FDCPA does not apply to debts incurred for commercial reasons). Appellants maintain that the FDCPA should apply because the “fraudulent conveyance action isn’t based on an underlying business tort judgment, but instead involved allegations that the transfer of a personal residence from Stephen Turner and other entities to Susana Turner was to defraud creditors.” However, as the District Court correctly concluded, appellees’ efforts are not converted into an attempt to collect a consumer debt merely because the fraudulent conveyance action involved Stephen Turner’s home.
Turner’s underlying “obligation” to pay Yeo and Martini does not arise out of a consumer transaction, and hence is not a “debt” within the meaning of the FDCPA. We therefore hold that the FDCPA does not apply to appellees’ efforts to collect the damages awarded for Stephen Turner’s commercial torts. Hence, the District Court properly concluded that the FDCPA does not apply.[15]

RICO

Civil liability under RICO is premised on violations of one or more of the provisions of § 1962. The provisions at issue here are 18 U.S.C. §§ 1962(c) and 1962(d). Section 1962(c) provides:
It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise’s affairs through a pattern of racketeering activity or collection of unlawful debt.
Section 1962(d) states: “It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.”
Because appellants contended that ap-pellees engaged in “a pattern of racketeering activity,” not “collection of unlawful debt,” appellants’ complaint must allege (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. See Sun Sav. & Loan Ass’n v. Dierdorff, 825 F.2d 187, 191 (9th Cir.1987).
As previously described, the “racketeering activity” appellants complained of eon- *1229 sisted of representations by appellees in mail, fax and telephone communications to various insurance companies believed to be debtors of plaintiff WPS, that the Superior Court for Contra Costa County had ordered any monies owed to WPS to be turned over to appellees. Appellants contended that the Superior Court’s turnover order only applied to Stephen Turner; that WTS was not owned, operated or controlled by Stephen Turner; and, therefore, that the Superior Court did not order that monies owed to WTPS be turned over to appellees. Appellants maintained that each time appellees misrepresented the substance of the turnover order, they committed an act of mail or wire fraud and of obstruction of justice. The alleged “enterprise” through which this “racketeering activity” was said to have been carried out was, as previously noted, the law firm of Cook, Perkiss & Lew. The District Court dismissed appellants’ RICO claim, ruling that appellants had failed adequately to allege that appellees’ conduct constituted a “pattern of racketeering activity.” Whether the District Court ruled correctly is the question now to be addressed.
“[Racketeering activity” is any act indictable under several provisions of Title 18 of the United States Code, and includes the predicate acts of mail fraud, wire fraud and obstruction of justice, each of which is alleged in this case. See 18 U.S.C. § 1961(1) (identifying § 1341 (mail fraud), § 1343 (wire fraud) and § 1503 (obstruction of justice) as predicate acts under RICO). In order to constitute a “pattern,” there must be at least two acts of racketeering activity within ten years of one another. 18 U.S.C. § 1961(5). However, while two predicate acts are required under the Act, they are not necessarily sufficient. H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 237-38, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (citing Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). A “pattern” of racketeering activity also requires proof that the racketeering predicates are related and “that they amount to or pose a threat of continued criminal activity.” Id. at 239, 109 S.Ct. 2893. Evidence of multiple schemes is not required to show a threat of continued criminal activity, id. at 240, 109 S.Ct. 2893, and, indeed, proof of a single scheme can be sufficient so long as the predicate acts involved are not isolated or sporadic. Sun Sav., 825 F.2d at 193, 194. The Supreme Court, in H.J. Inc., 492 U.S. at 241, 109 S.Ct. 2893, expounded on RICO’s continuity requirement, stating:
“Continuity” is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition .... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement[.]
Thus, in order to allege open-ended continuity, a RICO plaintiff must charge a form of predicate misconduct that “by its nature projects into the future with a threat of repetition.” See Religious Tech. Ctr. v. Wollersheim, 971 F.2d 364, 366 (9th Cir.1992); Sever v. Alaska Pulp Corp., 978 F.2d 1529, 1535-36 (9th Cir.1992); Medallion Television Enters., Inc. v. SelecTV of Cal., Inc., 833 F.2d 1360, 1363-64 (9th Cir.1988) (discussed infra). Conversely, an alleged “series of related predicates” not “extending over a substantial period of time” and not “threatening ... future criminal conduct” fails to charge elosed-ended continuity. See Howard v. America Online, Inc., 208 F.3d 741, 750 (9th Cir.2000); Religious Tech. Ctr., 971 F.2d at 366; River City Mkts., Inc. v. Fleming *1230 Foods West, Inc., 960 F.2d 1458, 1464 (9th Cir.1992).
Appellants contend that the District Court erred in dismissing their RICO claims for failure to allege a continuing pattern of racketeering activity. They argue that their allegations that appellees had engaged in a “continuous pattern of mailing hundreds of fraudulent letters” satisfied RICO’s continuity requirement, and, therefore, adequately alleged a “pattern of racketeering activity.” They cite our decision in California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466 (9th Cir.1987), as support for this proposition.
In California Architectural, the defendant-appellee contended that the alleged predicate acts did not satisfy RICO’s continuity requirement because the predicate acts all related to a single criminal episode. 818 F.2d at 1469. We disagreed with this contention, finding that multiple criminal episodes are not required to establish a pattern of racketeering under RICO. Id. Appellants in the case at bar argue that the District Court’s decision was in error in light of California Architectural. We disagree. The District Court acknowledged that appellants “need not plead multiple ‘criminal episodes’ in order to state a RICO claim.” However, because appellants had alleged only a single scheme, the District Court required confirmation that the criminal activity would continue. The court concluded that appellants’ pleadings failed to provide such confirmation because appellees’ activities were destined to end once the collection of the tort judgment was complete.
The District Court canvassed a number of other decisions of this court — decisions subsequent to California Architectural. Thus, the District Court relied on Medallion, in which, in sustaining a grant of summary judgment against RICO plaintiffs, we said:
Continuity does not require a showing that the defendants engaged in more than one “scheme” or “criminal episode.” The circumstances of the case, however, must suggest that the predicate acts are indicative of a threat of continuing activity. Here, that threat is absent.... In essence, Medallion’s allegations concern a single fraudulent inducement to enter a contract. Once the joint venture had acquired the broadcast rights, the fraud, if indeed it was a fraud, was complete.
833 F.2d at 1363-64 (internal citations and footnote omitted). Similarly, the District Court looked to Religious Technology Center, in which, in sustaining dismissal of certain RICO defendants, we held that, “[s]ince the only goal of the Greene defendants was the successful prosecution of the Wollersheim state tort suit, there was no threat of activity continuing beyond the conclusion of that suit.” 971 F.2d at 366.[16]
In the case at bar, appellees’ alleged actions, like those just mentioned, failed to satisfy H.J. Inc’s, open-ended continuity requirement since the alleged actions were finite in nature in that the mailings, faxes and telephone calls would cease once ap-pellees collected the outstanding tort judgment against Stephen Turner. Indeed, in their Second Amended Complaint, filed on April 22, 2002, appellants acknowledged that “the racketeering activity [was] ‘closed-end’ and [was] not expected to repeat,” unless “the judgment remained[ed] unpaid and Cook [continued] on the case.” Cook’s firm had withdrawn from this case in March, 2002.
Moreover, appellants’ allegations failed to satisfy H.J. Inc’s closed-ended continu *1231 ity requirement. In their Second Amended Complaint appellants list 94 companies that, according to appellants, received ap-pellees’ alleged fraudulent communications in June or July of 2001, and some of which may have received follow-up calls to these communications at an unspecified time. Besides these 94 communications, appellants only specifically alleged three additional fraudulent communications by appellees. These alleged communications included (1) a letter sent to Travelers Insurance Company on August 4, 2000 (attached to Original Complaint at Exhibit C); (2) a letter “sent by Defendants during September 20, 2000 to a third party” — that third party being appellant WPS (attached to Original Complaint at Exhibit E); and (3) letters, faxes and telephone discussions with the paramedical services company AMSA from December 2000-February 2001(items which appellants failed to allege or document with any specificity). Because almost all of the alleged fraudulent communications occurred during the two month period between June and July of 2001, and the additional three categories of communication occurred only sporadically in the preceding year (and one of these communications was sent to one of the appellants) appellants have failed to allege a “series of related predicates extending over a substantial period of time.” Having also failed to allege a threat of “future criminal conduct,” appellants have not demonstrated continuity over a closed period.
Thus, having failed to aver that the alleged acts of mail fraud, wire fraud and obstruction of justice had the requisite continuity, appellants did not sufficiently allege a “pattern of racketeering activity.” Accordingly, the District Court properly dismissed appellants’ RICO claims.[17]
Conclusion
The dismissal of the FDCPA claims and the RICO claims was proper. Accordingly, the judgment of the District Court is affirmed.
AFFIRMED.

. According to appellants' pleadings, WPS was owned by the Golden Gate Trust, a family trust of which the Turner children were beneficiaries. Stephen Turner, a physician, provided medical services to WPS and Susana Turner was WPS' general manager. WPS did not join in the FDCPA cause of action.

. According to appellants’ pleadings, Cook, Perkiss & Lew “substituted out” as attorneys for Yeo and Martini sometime around March, 2002.

. Section 1692c(b) states that, without prior consent, "a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector.”
Section 1692e prohibits the debt collector from using “any false, deceptive, or misleading representation or means in connection with the collection of any debt[,]” and outlines conduct constituting a violation of the section. Such conduct includes the false representation of “the character, amount, or legal status of any debt[,]” 15 U.S.C. § 1692e(2)(A), and “[t]he use or distribution of any written communication which simulates or is falsely represented to be a document authorized, issued, or approved by any court, official, or agency of the United States or any State, or which creates a false impression as to its source, authorization, or approval!,]” id. § 1692e(9).
Section 1692f prohibits the use of “unfair or unconscionable means to collect” a debt, including, pursuant to § 1692f(l), the collection of monies that are not "expressly authorized by the agreement creating the debt or permitted by law.”

. Section 1692d states that a "debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt.”

. Section 1692f(6) prohibits the "[t]aking or threatening to take any non-judicial action to effect dispossession or disablement of property” if there is no present right to possession of the property, there is no present intention to take possession of the property, or the property is exempt by law from dispossession.

. Section 1962(c) provides: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.”

. Section 1962(d) adds: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.”

. See footnote 1, supra. In their Second Amended Complaint, appellants asserted that, in addition to themselves, there were other victims of appellees’ fraudulent activities. These alleged additional victims included American Paramedical Services, a New Jersey LLC managed by Stephen Turner's sister; Robert Matthews, who had provided financial services to Stephen Turner; and the insurance companies that received Cook's communications.

. The letter from the attorney for the trustee states: "The Trustee's position is that since the matter has been briefed and argued, the parties should allow the Court to rule on the appeal. In the event that the judgment is affirmed, there is nothing remaining for the estate to administer. In the event that the dismissal is overturned, then the estate will have a claim against the various defendants and will proceed accordingly.”

. Turner relies on Bankruptcy Rule 6009, which states, "[w]ith or without court approval, the trustee or debtor in possession may prosecute ... any pending action ...” However, because a trustee has been appointed, Turner is not a debtor in possession, and thus, cannot prosecute this action. (" 'Debtor in possession' means debtor except when a person that has qualified under § 322 of this title is serving as trustee in the case.” 11 U.S.C. § 1101.).

. In Dunmore v. United States, 358 F.3d 1107, 1112-13 (9th Cir.2004), this court recognized that if a bankruptcy petitioner were to make an "understandable” mistake in suing in his own name, he could proceed under Fed.R.Civ.P. 17(a) if the real party in interest were to ratify his actions. During a bankruptcy proceeding, Dunmore, the petitioner, secured the bankruptcy trustee's abandonment of his three tax refund claims. Accordingly, we concluded: "We assume without deciding that when the bankruptcy trustee abandoned the refund claims in February 1999, the abandonment could constitute the estate's ratification of Dunmore’s lawsuit.” Id. In the instant matter there has been no trustee abandonment.

."There is abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors.” 15 U.S.C. § 1692(a). "Existing laws and procedures for redressing these injuries are inadequate to protect consumers.” Id. § 1692(b). "Means other than misrepresentation or other abusive debt collection practices are available for the effective collection of debts.” Id. § 1692(c). "It is the purpose of this subchap-ter to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses.” Id. § 1692(e).

. Some years earlier, the Third Circuit, in Zimmerman v. HBO Affiliate Group, 834 F.2d 1163, 1168 (3d Cir.1987), reached a similar conclusion, observing that "nothing in the [FDCPA] or the legislative history leads us to believe that Congress intended to equate asserted tort liability with asserted consumer debt.”

. The fraudulent conveyance action listed as defendants Stephen Turner individually and doing business as Insurance Medical Expert, aka California Paramedical Services, aka Worldwide Health Services; Stephen B. Turner Family Trust; Real Investment Capital Holdings, LLC; and unnamed individuals.

. In affirming this 12(b) dismissal, we do not suggest that any of appellants’ allegations of fraud would be sustained at trial.

. The District Court also relied on Sever, which, in discussing continuity, followed Medallion. 978 F.2d at 1535-36.

. Because appellants failed to allege the requisite substantive elements of a RICO claim under 18 U.S.C. § 1962(c), appellants' claim under 18 U.S.C. § 1962(d), which makes it "unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section,” also fails.